All right. Hear ye, hear ye, hear ye. This honorable appellate for the 2nd District is now open. Pursuant to adjournment, the Honorable Susan Faye Hutchinson is honored. Please be seated. Your Honor, this is the first case of the morning. Call to 11-792. People of the State of Illinois v. Michael Luciano. On behalf of the Avalanche, Jonathan Easting. On behalf of the Allee, Ms. Mary Beth Burns. Mr. Easting, are you both prepared and ready? Mm-hmm. Good morning, Your Honors. I'd like to hold about two minutes of my time for rebuttal, please. You'll have about five, so you'll hear it. Thank you. As the Court will recall, there's two issues raised in the briefs in this post-conviction case. I plan to focus on the first issue, which is the unconstitutionality of the sentencing statute. I'd like to also briefly address the second issue, which is the claim under the Williams rule of ineffective assistance. Your Honors, Michael Luciano is today in prison for life under a sentencing scheme that the Constitution forbids is cruel and unusual. The scheme in this case forced the Court to impose on Michael the most severe penalty that Illinois allows, to do so for actions he undertook as a minor, and to do so without any discretion or the ability to hear any evidence of mitigation. The State seems to think that this is not a mandatory life sentence. Do you want to speak to that? Your Honor, it most certainly is a mandatory life sentence. In terms of precedential law, we need to look no further than Leon Miller. I believe it's the last time the Illinois Supreme Court addressed this directly. It certainly held there that it's mandatory. Both the recent cases that came out of the First District that rejected this affirmative defense statute certainly expressed that it is a mandatory life sentence. And I'd also suggest that we can look at the record of sentencing. I mean, for a case where somebody's in prison with no hope of ever getting meaningful release, the sentencing hearing in this case was something like four or five sentences long because, you know, the Court and defense counsel both realized that there was simply no option here other than a mandatory natural life term. For purposes of voidness, to avoid forfeiture, does that pertain to any sentence that is statutorily unauthorized or violates the Constitution, or does it apply only to a provision that's unconstitutional on its face? Your Honor, a court can't act in excess of its constitutional authority more than it may act in excess of its statutory authority. Therefore, your argument is it's a substantive, not procedural. Well, it is also substantive and not procedural. I believe that we don't even have to reach really the substantive procedural question because I'd submit that finding it void would entitle my client to relief under Illinois law and that we don't have to step into these questions of entanglements with federal law and the complexities of Teague analysis. In particular, your Honor, I would note that this Court a few years ago, in the McCoy case, which was cited in the briefs, recognized it was an earlier challenge to the statute that it violated the Eighth Amendment Proportional Penalty Clause because it was mandatory. This Court recognized that that was a voidness challenge and that if the defendant in that case had succeeded, it would entail a finding that it was void. What are the parameters if there is a resentencing? The parameters on resentencing, your Honor, I'd submit that first we have to look at what the statutorily authorized sentence would be. So we look at the code as of the time of the offense. In this case, that's 1990. Given that we would be excising the mandatory natural life portion, then there's a question of what remaining statutes are authorized. I haven't found any authorization there for discretionary natural life. There might be some cases where there's additionally a fine, brutal, and heinous that might create discretionary life or cases that occurred more recently where there's a firearm enhancement that might create the possibility of discretionary life. But there's no statutory authorization of discretionary natural life here. So the base range would be 20 to 60 under the 1990 statute. If we removed only the unconstitutional aspect, for example, under the law, an adult is still eligible or not eligible, mandatory natural life sentence. So if we removed only the unconstitutional provision, wouldn't that make a life sentence permissive under the old statute? The problem is then we're getting into a question of can we reconstrue the statute? If this was the first pass, if the statute had just been passed and it's a question of, okay, can we do a doctrine of constitutional avoidance on this, I would suggest that Your Honor would be correct. The problem is we have an entire body of law that has already construed the statute. We have cases like Miller. We have this, you know, this has been challenged over and over by defendants. And for most of the times since the statute has passed, the courts have put out the answer that, yes, this is mandatory, no, this court has no option. Because the statute has already been construed, I don't think this court can reconstruct it to say the legislator intended something different than it did, given all our past precedent. Well, Miller v. Alabama doesn't say that a discretionary life sentence is inappropriate, does it? No, Your Honor. The prohibition is on mandatory life sentences. Did Morphin? Morphin also did not rule that. The prohibition of Miller v. Alabama, the same one that issued Morphin as in the recent Williams case, that's a prohibition on mandatory natural life sentences imposed on juveniles. In terms of the scope of the remedy, which is what I think Justice Burkett's questions are directed to, I'd submit that, you know, perhaps if we had some sort of legislative solution, the legislature has not moved yet. In some states, I believe very recently in Michigan they've decided we can, Michigan's a state that still has a parole regime, which we rejected in Illinois several decades ago. But, you know, making these defendants eligible for parole in some states that have that regime is a solution. But in Illinois we rejected parole, and it's certainly not to this Court to recreate a parole regime that hasn't been in existence for decades. The statutory scheme here just doesn't leave much choice. And I also submit that it would still be a very severe sentence, and even if it was a near maximum sentence under the 20 to 60 range, that would be very close to de facto natural life for my client, especially given the unusual situation that the state had dropped the charges, and my client, you know, lived and built a life over, you know, 15 years since they dropped these charges in 1992. Well, let's talk about that. I mean, I don't want to hear your sentencing arguments. You can say those should you get back to the trial court. But let's talk about the compulsory joinder and the speedy trial argument that you make in the brief. Yes, Your Honor. As I'm sure the Court is aware, we're raising it, my client, in a very detailed pro se petition, raised it, you know, through a question of ineffective assistance because, you know, the attorney that he shared with his father, the co-defendant, you know, did not raise this claim under the Williams rule. I think, you know, it's very important for the Court to note the various standards at issue here. I'm not asking this Court to resolve the actual speedy trial claim today. You know, all the dispute between Mr. Luciano and the state is really just a question of, you know, first, it's prejudice for an ineffective assistance counsel claim, so that's only a reasonable probability of a different result. Under Hodges, we only need to show that that reasonable probability of a different result is arguable in law and fact. Under the successor case to Hodges-Brown, we need not, that was a case where the defendant didn't allege anything at all on prejudice and the Court found that it could infer some of the facts from the records on prejudice. We need not do all the specific facts. And on top of that, we have rules about liberal construction of the speedy trial statute at issue here. It is a fairly, in the briefs, it's a fairly lengthy and complicated issue. It really boils down, at this point, to two points of dispute between Mr. Luciano and the state, and that is, what did the state know when, and are these based on the same act? As to the question of what did the state know when, I'd submit that that's exactly the kind of question for which remand, an attorney, is necessary, you know, because that's information, you know, that's most in the hands of the state. Well, that information was also in the hands of the trial court, who ruled that at the time the state did not know because a lot of these informants that corroborated the main informant had not yet saw the light and told, essentially, you know, gave the same story that they gave the trial, and the Court ruled. You seem to argue in your brief that the Court should be limited to just looking at the petition, but in a first-stage review, the Court can look at the entire record, including the transcript of the trial. Correct? Yeah, I would submit that we wouldn't look at the entire review, the entire record. The review of the Court's order is also to know. It also suggests that Hodges and the similar cases also indicate we take these pleadings in the petition as true if they're not rebutted by the record, and here, you know, my client most certainly does claim that the state did know. And in the record, many of these witnesses that testified, Acevedo and others, admitted that they had lied earlier and that they had just recently seen the light and now were giving the story that they provided a trial. That was before the Court, and the Court considered that in making the finding that at the time that the state and Ali Prask, the solicitation charge, the state did not know in the sense of some level of confidence in pursuing a case. Would you agree that the standard's not probable cause, that the state has probable cause? They have to have knowledge or some certitude that they're going to get a conviction. Well, Your Honor, I'd submit that the state certainly showed that it had that certitude when my client was sentenced on these gun charges in 1992. It had put an investigating officer on the stand and laid out very nearly the entire theory of the case that would later indict him under a 2007. The standard of the sentencing hearing is much lower. It's just whether or not the evidence is relevant and reliable. It's not proof beyond a reasonable doubt or even a preponderance of the evidence of the sentencing hearing. Your Honor, I – because, you know, the charges were dropped here, we don't know whether the state could have proven the case beyond a reasonable doubt. But it – I don't – you know, there's nothing in any of the authorities that Byron Williams or Quigley that's – that indicates that proof beyond a reasonable doubt is what the state had to have in its possession. We know that based on these facts, it didn't make the call to take Robert Rangel to trial, for example. So it believes – Well, Rangel was acquitted. That's right. And that, in part, motivated the state to not go forward with the solicitation charge, even though it wasn't solicitation to commit murder. It was solicitation for unlawful discharge. That – I mean, but the – I'd submit that to bring this in at sentencing, so it was a judgment by the state and because the court used it, the court, that there was enough reliable evidence here that was worthy of consideration. Plus, you know, the fact that they took basically this theory to Rangel's trial certainly believed – you know, I don't think the state would have taken a case to trial that it didn't believe it could prove beyond a reasonable doubt. Let's talk about the purpose of Section 3-3 is to protect the defendant's rights against double jeopardy as well as making sure there's no ambush. Yes, that's correct. The state's not allowed to ambush. There was – neither one of those played a role in this case. There was no ambush, correct, and there's certainly no double jeopardy, correct? I would concede it doesn't violate the double jeopardy clause. I would submit that these statutes were passed especially in light of the kind of charging the state took in the C.U.C.B. Illinois case, which was that was a murder where the defendant shot several victims in an attempt to get the death penalty. The state charged them independently in sequence from victim to victim. That's why we have these compulsory joinder rules. It's to prevent that repetitious sort of charging, and the repetitious charging is exactly what we have here. I mean, I can't speak to what the state's charging strategy was in 1991 and 1992, but what it – they did choose the very unusual charge of solicitation of aggravated discharge of a firearm. That – I'd submit that the very choice of that charge, you know, suggests that the state was engaged in the sort of strategic gamesmanships of charging that these statutes, you know, came into force to prevent. How do you distinguish the Ursary case? The Ursary case? I mean, is that not on all fours with the case that we have here? I would submit that the Ursary actually helps Mr. Luciano's position here. How is that? I mean, in that case the state only suspected – just as here they suspected that your client committed the offense but didn't have enough evidence until the feds took these people and then they flipped for King County. So how is it any different? I'd submit that Ursary's not about the quantum of the evidence as much as it is about what did the state believe. In Ursary, there was a defendant who initially claimed self-defense. There's no dispute that he was involved in the, you know, in the incident. It's only later when a police report came in that implicated him, and Ursary dates the state's knowledge for the moment. Didn't he tell self-defense? There was a police report that included a statement of a witness that the Ursary did indicate. He was in jail and he started blabbing, and that's when they then charged him. So, I mean, in that case they weren't – they only suspected that he, in fact, was a shooter. They didn't have enough evidence, so they charged him with the weapons offense, basically as we have here. I think that certainly as a prosecutor and as a police officer, you suspect that that person did it, but that certainly is not enough. Your suspicions is not enough to bring a charge against him. Well, we have more than suspicion here. The important fact of Ursary is that the court there dated the state's knowledge from when it first got this report that the Ursary defendant had confessed to somebody else. Now, maybe the state believed that was enough to take him to trial. Maybe they did not. Here, the record shows that the investigators had reports all the way back as a couple of weeks after the shooting that somebody implicated my client in the shooting. If we're looking at the first statement by a witness implicating a client, as Ursary did, then that necessarily entails that the court had the knowledge required in 1990. Well, you know, as a prosecutor, when prosecutors look at a charge, they have an obligation to look at the charge from the moment they charge all the way up to and through the trial and beyond. And if they determine that they don't have sufficient evidence or, quote, unquote, knowledge to charge, their obligation is not to take the case to trial but to dismiss it at that juncture. And if evidence later on is supportive of the charge and they bring the charges in at what the record shows here occurred? If I might have a couple of moments to answer your question, Your Honor. Go ahead, please. Yes. Your Honor, I would submit that the prosecutor's choice not to charge can't be a statement about their lack of belief because that would be conferring the complete discretion, effectively eliminate the speedy trial statute in this rule if we are to find that the mere act of discretion by a prosecutor is evidence that the prosecution didn't violate the statute. Counsel, they lost the Rangel case. Yes, they did. They laid out this theory, the theory of the case, as you say, in the sentencing hearing for Mr. Luciano on his gun charge or the solicitation charge. But they didn't have any witnesses. How does one proceed if you have no witnesses? Well, Your Honor, I submit they had statements and they had some witnesses. They – it appears they had – Who later said they were lying. Rodriguez. That it's not unusual at all in this state for, you know, for the state to take something to trial solely on the prior and consistent statements of flipping witnesses. You know, the speedy trial argument doesn't hinge on whether the state proved its case. It hinges on what they know when they made the decision not to charge. Thank you, Your Honors. Thank you. Thank you. Well, welcome, Ms. Burns. We – looking at the briefs, I wasn't expecting to see you here today. I hope you knew about it before yesterday. I did, Your Honor. Thank you. And I also want to thank this court because I found out fairly recently that I would be doing the argument. And this court very kindly allowed us to have the record Friday. And so at least I was able to read parts of it. And going back to what was most recently discussed, among the parts of the record that I was able to read included the appendix to the defendant's post-conviction petition, which is what I believe the defense is relying on in saying that the state knew enough to proceed. However, in reading that appendix, I don't find it as clear as the defense presents it. There are a number of police reports and a number of pages from transcripts which all sort of run together and never plainly state what the defendant's role was. They do let it be known that the defendant's father on hell was the Inca who was the Latin King's head in Aurora at that – group of Latin Kings in Aurora at that point. And you can tell that the defendant distributed weapons. Other than those two things, there really – the exhibits to the post-conviction petition do not indicate the type of evidence that showed up later. They do, in fact, support what were the earlier charges, which were the weapons possession charges. So what do we do about the speedy trial demand? The prosecutors can look at a case and decide to charge part of the case and hold on for a few years until they find some evidence to charge perhaps the more serious offense. Yes, Your Honor. Yes. Because it's unethical to proceed as a prosecutor on a charge that you can't prove. If we as a matter of course charged cases that we could not prove up, we'd all be in front of the ARDC. We'd spend our lives trying to explain why we were bringing charges on cases that we couldn't prove up. We don't have a right to make a defendant stand in court on a case that we don't believe we can prove. But do you have the right to have two bites at the apple? I'm going to hold on. I'm going to charge him with the weapons offense and hold on. And, hey, if something new comes up in a few years, I'll charge him on something else. There's no statute of limitations on murder, Your Honor. If we find out 20 or 30 years down the road that, in fact, we can support a murder conviction, nothing prevents us from taking it forward. If the theory of the prosecution was going to be accountability or common design solicitation, then why did the State bring that charge in the first place instead of just proceeding? I'm sorry, the solicitation of? Solicitation of aggravated discharge is the same theory that the defendant was found guilty of murder on, solicitation, or his accountability theory. Joint venture, it's common design, all the same thing. It was the same meeting, same act or same set of acts that were the predicate for the murder charge some 16 years later. Again, the impression that I got from reading the items in the defendant's appendix is that the police initially had a confidential informant, who I think turned out to be Miguel Rodriguez or Acevedo, I forget which one was which, who said that there were, I think he discussed two meetings, and that weapons were distributed, and somebody said something to the defendant, and he said, yeah, they're going to hit Gonzalez. Didn't say, I'm telling you to hit Gonzalez. Didn't say, this is the plan, I'm telling you we are hitting Gonzalez.  That doesn't show that the defendant is in fact directing the meetings. It doesn't show that the defendant is the person making the choice that this is going on. However, in support of the solicitation of the aggravated discharge, I suppose the state believed at that point that that was sufficient for an aggravated discharge, but not for a murder. What about the fact that there was a plea agreement? I'm sorry? There was a plea to the weapons charge. The state agreed to dismiss the count, the solicitation charge. Is that in any way still not binding on the state because it's the same allegation, it's just a different substantive charge? I think it's not the same substantive charge in that, as the earlier discussion with counsel, you're looking at different elements also by the time that they charged him. How are you looking at different elements? You're looking at different elements in that once you actually have a murder, you have to show the intent to kill, not merely the intent to shoot up the house. You have to show that, in fact, the defendant was in some directory capacity, that he was somebody who was, in fact, genuinely accountable, not merely because he handed out the guns, but because he was the person who was running the meetings. He wasn't merely the person who said, yeah, they're going to shoot Gonzales. He's the person who said, we're going to hit Gonzales. So at this point, you have stronger evidence against the defendant than you did at the time you entered into the plea agreement to nolly-cross the charge and proceed with the weapons charge. Is that correct? Yes, Your Honor. So is that not a gray studicata? I mean, did you not have the opportunity, or Double Jeopardy, did you not have the opportunity at that time to proceed on that charge? No, Your Honor. I'm not saying we couldn't have proceeded on the aggravated discharge. No. They nolly-crossed that as part of a plea agreement. Nothing would have precluded them had there been no plea agreement to take that to trial. What they couldn't have taken to trial was a murder charge at that time. Once they entered into the plea agreement, they extracted a plea from the defendant in exchange for a promise to dismiss other charges. Isn't that correct? Well, dismiss that particular charge, yes. Again, there's no statute of limitations on murder, and murder was not before the court or counsel for either side at the point that the plea agreement was reached. Well, what was different, in fact, about what happened in 1991 at the plea and what happened later? I mean, what's the difference? The difference, and this really comes out in this court's Rule 23 order in the direct appeal, was that there was a significant federal drug investigation of the gangs in Aurora. And in exchange for what would be considered truthful testimony at that point, a group of drug offenders who had admitted to lying in earlier murder trials, not just this one, as part of federal drug deals all agreed that they would testify truthfully. And a significant number of murders in Aurora were, in fact, resolved based on the federal drug deals with these defendants. But most of those murders, if not all of those murders, were resolved as a result of this federal investigation, because this is not the first case we have received with respect to people flipping. That's correct. Those cases did not proceed piecemeal as this case has proceeded. This may be an unusual situation. I think it is. The defendant's other conviction for the murder of William R. Say I think was a similar situation where I think the charges were brought later. Is it sufficient for the trial court in this court to determine what the state knew and when they knew it without a hearing? The defendant makes a compelling argument that this should go back for a second stage and perhaps a third stage review because the state's attorneys change. The state's attorney in 1991 was different than the state's attorney in 2007. How can we tell from a cold record what the state knew and when they knew it for purposes of pursuing this issue of knowledge or known under 3.3? I guess my only answer to that would be that when the trial court made the determination that it had enough to dismiss, it relied on the record presented, it relied on this court's view of the record that was presented, and I presume, though it doesn't discuss the appendix, the trial court read the appendix and the appendix does not provide enough substantive information to imply that the state was sandbagging essentially because neither the police reports nor the transcripts that are appended are so clear cut that they could have indicated that the state had sufficient evidence to go forward. So I guess my position would be that the trial court had enough before it based on the trial transcript, based on this court's review of the transcript, and based on the transcripts that were appended to make the determination that the people did not have sufficient information to go forward at that point. And therefore there's no colorable claim of ineffective assistance of counsel for failing to file a motion to dismiss? Yes, Your Honor. Oh, I'm sorry, I thought you had a question, Your Honor. But if they laid out the theory of their case as counsel has indicated, and they look pretty similar if you look at them on paper, in 1991 or early 1992 at the sentencing on the weapons charge, how can we not find that there is at least some information in that petition to go forward and now start asking questions? I guess this depends on how you read Hodges and various other cases as to what has to be presented. And I guess when you look at what we have now before us, I'm not sufficiently convinced based on what we have before us that there's additional evidence to be determined at an evidentiary hearing. But the witnesses laid out when they testified when they made their decision to tell the truth. Yes, Your Honor. And that's not contested. And again, I think part of the problem is the defense theory is that the people had enough to go forward, and the trial court determined that the people did not have enough to go forward. Nothing that seems to have been developed at the trial, nor in the defendant's exhibits, would indicate that the people had anything more than probably a strong suspicion that Michael Luciano was in fact guilty of the murder by accountability. However, until they had the information that stemmed from the federal drug prosecutions, they did not have strong enough evidence to actually proceed in a murder prosecution. I understand that your question is, would an evidentiary hearing provide additional information as to what was known at what point? Was there sufficient information prior to the federal drug investigation? And in truth, and I'm sorry if this sounds like a cop-out, ultimately that is what you will have to decide. The trial court reached one decision, but you have the parties before you each taking fairly diametrically opposed positions. Do we have to make that decision, or can we send it back on a post-conviction petition to proceed to stage two? No, that's a decision that I meant that you have to make, whether to accept the trial court's determination or whether to send it back. We would not be ultimately making the determination as to whether or not. No, the determination you're going to make is which of fairly diametrically opposed views of the actual post-conviction proceeding are the appropriate ones. Thank you. Chronologically, was Rangel charged with the Gonzales murder at about the same time that Luciano was charged with the weapons and the solicitation charge? I'm sorry, Your Honor, I don't know that. Okay. And I don't know if that's actually in the record, but my review of the record really was limited to the post-conviction materials, so I apologize. And you started your presentation by talking about unethical, be in front of the IRDC rather than trying cases. What was so compelling that they had to charge the weapons charge and the solicitation charge at the time they did? Why didn't they wait for better evidence? Well, the weapons charges, they had quite a bit of evidence, and you have, unlike murder, a statute of limitations on them. And so at the point where you have enough evidence to try particular charges, nothing would prevent you from going forward on those charges. However, if the state had waited for additional information, the state very well would have lost the charges based on the statute of limitations. Again, there was up front significant evidence that Luciano handled the weapons. And that was actually fairly reasonable at that point. Didn't we have fingerprints of his on certain pieces? We had fingerprints. We had, you know, for all of the flipping that various witnesses did at various points, there was some consistency to the fact that Michael Luciano had in fact distributed weapons and had taken them back and then put them in a girlfriend's bedroom of some sort, I guess, when Ivan held Luciano's. And I think there may have been some dispute as to which of the two girlfriends they discussed actually ended up with the weapons. But I think it was fairly consistent that Michael Luciano was the person who distributed them and that he was the one who then took them and they were either wrapped in blankets or wrapped in towels, but that they were wrapped and then he, I think. I also think at that point, and I apologize, this might have been later, I thought at that point also they had information that he had cleaned the weapons, but that may have come out of the Aurora stuff. I apologize. The weapons were wiped clean. I'm sorry? They were wiped clean. Yes. Tell me what is your position on Miller v. Alabama? We didn't even discuss that and whether you believe it's substantive or procedural or if there's a difference. I think Miller makes it absolutely plain that it's procedural. I want to say at 132 Supreme Court 2471, Justice Kagan says very specifically that they're talking about procedure, not about the actual. May I make one more point on the first issue? Go ahead. Can you continue where you were on Miller? I'm sorry? Can you continue what you were saying about Miller? I think my points on Miller would be just several very short ones. It's clearly procedural. It does not meet Teague's second exception. A colleague of mine gave what I think is perhaps as good an analogy of watershed that I've heard. Her analogy was you're walking one way, and then once the decision comes, you in fact do a complete 180 and go the opposite way. That's not what's happening here. Justice Kagan in her majority opinion specifically says over and over and over again that this is in reliance on the natural outgrowth of Graham and Roper. Also, they talk about the reasoning that led to Adkins. So the majority opinion would lead us to believe that this was a natural outgrowth. And because it was a natural outgrowth, it can't really be watershed. It can't really be a significant change. Also, I think to the extent that we're talking about a 17-year-old who had been convicted twice of first-degree murder by proof beyond a reasonable doubt, the procedural problem is less compelling than some other procedural problems which have not been found to be Teague-barred. Now, you're making your argument at sentencing in the event that that's what happens in this case. And we wouldn't let counsel, so we would prefer you not do it. Thank you. Is there anything that would preclude one from being sentenced to natural life discretionary sentence as opposed to mandatory, as the statute sets out in Illinois? I don't believe so. The opinion at Miller really is limited to mandatory natural life sentences. Again, I believe, and this may be at the same site, the 2471, I believe that Justice Kagan implies that natural life would be an available sentence, though I think the majority takes the position that it should be rare. And I think in Illinois, my understanding is that the only thing that would be available for an offender under 18 would be for a double murder, and so it would be rare. And if, in fact, this were a new trial now, I believe that natural life would be an available sentence following a sentencing hearing. Would be an available sentence? Yes. But again, it would have to be after a sentencing hearing where the trial court heard both aggravating and mitigating evidence. And the majority opinion would lead one to believe that the mitigating evidence must include a discussion of the age of the defendant and how that may have affected his behavior. I think the other thing I would like to briefly say is there was a discussion about voidness, and even the first district, in the Williams opinion, which found it was subject to, did a Teague analysis and found that it did, in fact, if it was in the first exception, did reject the voidness analysis. Thank you very much, Your Honor. Thank you. Mr. Easton? Yes, I'd like to address the sentencing question first, Your Honor. I'd submit that under the U.S. Supreme Court's Teague jurisprudence, it most certainly is a substantive rather than procedural determination. There's a couple of reasons. Miller relied on two distinct lines of authority. The first of those lines of authority are when we exclude a category of individuals from a particular penalty. This squarely does that. It excludes those under 18 at the time of their conduct from the penalty of a natural life sentence. From a mandatory natural life sentence? Yes, from a mandatory natural life sentence, which brings me to the second line of authority, which is how the U.S. Supreme Court has treated mandatory sentences. This is not the first time we've been through a legal debate about what is the implication of U.S. Supreme Court opinions that strike down mandatory sentences. Back in the late 70s and early 80s, when states were trying to rewrite all the death penalty legislation, a lot of states opted to do a mandatory sentencing regime. When there's particular aggravating factors, death must be imposed. When the U.S. Supreme Court struck down all of those eventually, it's very notably that in Sumner v. Schuman, it ruled that when it struck those down, it was striking them down on facial grounds, and it did so in a collateral proceeding. That was actually a federal habeas corpus case where it looked at Nevada's sentencing statute and found Nevada's sentencing statute unconstitutional. Given that Miller is based on the confluence of two different lines of authority that the U.S. Supreme Court has treated as substantive, then I would suggest that the rule that comes out of Miller most certainly is a substantive rule. And you believe it's retroactive, that Miller is retroactive? If it's a substantive rule, it's necessarily retroactive under Teague. Even if this court decides to look at Teague in the context of an Eighth Amendment violation, the fact that it's a substantive rule would necessitate retroactive application under Teague. And then finally, Your Honor, I do think the easier way to get there is simply this is an unconstitutional sentencing statute. An unconstitutional sentencing statute is void. Neither Williams nor Morphin, those two cases address this in any detail. They jumped into the Teague argument a little bit too easily. And finally, on the ineffective assistance of counsel claim, this is exactly the kind of fact-intensive issue for which the appointment of an attorney is necessary to further develop the claim. My client is a pro se litigant. He only had limited access to some discovery materials and whatever records he could develop. What we can flesh out through second stage and third stage proceedings would clarify this claim. His claim is far more detailed than, for example, the claim that the Illinois Supreme Court sent back in Brown, which was an argument that the defendant's counsel should have asked for a fitness hearing. The defendant claimed no theory of prejudice at all, no indication that he would be unfit. The Illinois Supreme Court said we don't require such factual detail on a claim of prejudice for ineffective assistance of counsel in sending for further proceedings. This is a little bit different than that. In a fitness claim, there's a lot that goes on outside of the record with respect to making a determination as to whether or not a person is fit or unfit. Attorneys, oftentimes there's nothing appearing on the record in open court that would indicate unfitness. It's based upon the conversations that the attorney has with his client. Here you have a trial record where these witnesses, witness after witness after witness, explained how they saw the light and came to tell the story that they told in 2007. Correct? Yes. This would be a mixture of on and off the record material because certainly what the state knew that, you know, the prosecution knew that didn't make it into the courtroom is an off the record question. And that's the kind of, you know, my client, we only have on the record material because that's all my client's going to be able to get access to that. And especially when we're really talking about whether it's an arguable claim, whether it's not frivolous, whether it's prejudice for ineffective assistance of counsel claim, given the liberal construction speed of trial statute, I would suggest not only that, you know, this court order resentencing under the first argument, but that it remand for second stage proceedings, the appointment of counsel to develop my client's claims under argument two. Well, a hearing might give us better pleadings. A second stage might give us better pleadings. But what's it factually going to give us in this case? Well, I suspect that when it might resolve the issue one way or the other when we look at the discovery materials because the only kind of, you know, police reports that we have are the ones that my clients had access to or the ones that happened to make it into trial because, you know, there was a statement that could be used in impeachment or something like that. We certainly don't have the entire panoply of discovery materials from, you know, the 1990, 91, 92 charging. Thank you, honors. Thank you. All right. Thank you for argument this morning, counsel. Ms. Burns, fast reading. And we will stand in recess to get ready for the next case and the decision in this case will be made in due course. Thank you.